Welcome aboard. Our second case is 20-2004 United States v. Guillen, and for the appellant is Ms. Morris. You may proceed. Welcome. Welcome. Good morning. My name is Melissa Morris, and I am from the Federal Defender's Office in New Mexico, and I represent Appellant Ethan Guillen. The agents in this case violated Ethan Guillen's rights under Miranda by doing exactly what Siebert says not to do. The officers in this case interrogated Ethan Guillen for nearly an hour before giving him Miranda warnings midstream after eliciting an unworn confession. In Siebert, the court explains the importance that a suspect understands both the import and effect of Miranda warnings. Why can we rely on Siebert? It only garnered four votes. It's a our general practice isn't to rely on plurality of opinions because they don't represent the binding precedent of the Supreme Court. If the three of us had a panel decision where I applied Siebert and Judge Baldock applied the Kennedy concurrence and Judge Carson dissented, I don't think you could say in a future case that Timkovich's view was the prevailing view of the 10th Circuit panel. So anyway, could you address that principle? I know there's a split out there in the cases, but explain your your approach to that problem. Well, Siebert is a very unique case in that the plurality decision was agreed upon by three or four, by four justices. There was also the concurring opinion by Kennedy, which basically was disagreed with by all the other justices. So it is very unique. It's also unique in that it doesn't overrule Elstead, the Supreme Court's other decision, which addresses these issues. But I would submit to the court that this is a situation where Mr. Guillen should prevail under both the voluntariness test that's announced in Elstead, along with the five Siebert factors. Also, Mr. Guillen would also prevail under the record to support Mr. Guillen prevailing under any of those opinions or theories. If you're one of those, you have to show bad faith, right? That's correct. What's the bad faith? So in this case, we have Agent Rominger who testifies that when they feel that it's time for Ethan to confess, they purposely confront him with the information that the other officers in the house had gathered up to that point. Rominger actually uses the words that he pushes Ethan. He purposely lays out all the evidence, the fact that the pressure cooker is missing, the fact that the soldering iron is missing. They talk about the black powder stains that are found on the table and the back porch. They also talk about the white tape that was found. He lays all that out purposefully to push Ethan and pressure him into confessing. And also, Rominger testifies that immediately after they elicit that confession that they sought, that's when the Miranda warnings were read to Ethan. And right after they read their Miranda warnings, they pick right up where they had left off. There's absolutely no break between the pre-Miranda questioning and the post-Miranda questioning. So even though the officers in this case aren't as forthright as the officers in Siebert, they don't directly testify to setting out to deliberately delay the Miranda warnings. The testimony here indicates that that's exactly what happened, that there was opportunity for the agents since they deliberately set out to confront Ethan with all this evidence, that they deliberately pushed him for a confession. There was opportunity for the agents to give the Miranda warnings ahead of confronting Ethan with this evidence in an effort to elicit a confession. However, they- It seemed to me here that this confession sort of sprung out of the defendant and that it wasn't a carefully led process. They tell him what the evidence is and then they ask him this really broad question, tell us what you know about this or something like that. And then next thing you know, they have a confession. I mean, don't you think it would be reasonable to construe that what the officers were saying as going down the interrogation path further and that even they weren't expecting a confession at that time? Well, there's testimony that Ethan had been questioned by the officers for approximately an hour before this confession was elicited. At one point, the officers decided to take a break. That's when they allowed Ethan to sit on the sofa to check his telephone. But this was a time, an opportunity for the officers to confer not only amongst themselves, not only Agent Rominger and Agent Green who were doing the questioning. They were also able to confer with the officers from the bomb squad who were doing the search of the house. They conferred about the evidence that was found. They planned to confront Ethan at that point. So, there's- The testimony supports that this was not a situation where a confession just sprung out like in Carousel Es Toledo, for instance, where the officer asked one question, a single question, what are you doing here? And the defendant in that case immediately confesses. This isn't that situation. This is a situation where there's testimony that the agents were coordinating amongst each other that- About the district court's fact finding, I mean, it applied CBER and found that the factors had not been met. Do we have to defer to some of the factual content there regarding the officer's intent and motivations? So, looking at the district court's findings in this case, the district court misapplied application of the CBER factors. The district court did find that the setting was the same for the entirety of the interrogation. The setting was the kitchen. Both of the officers involved in the questioning of Ethan were the same as Rominger and Green. However, the district court found that the second round was not continuous and that it focused on a different subject, the details of how the device was built and the reasons why. And then the district court also found that the information that Ethan provided after the Miranda warnings, like how the device was built was different. So, instead of treating the continuousness of the questioning and the overlap as different factors, the court treated them as the same factor in arriving at decision. So, in this case, what's important also is that the agents never advised Ethan that should he choose to invoke his Miranda rights, the pre-warned confession would not be used against him. And in CBER, the court delves pretty deeply into this. The court says that telling a suspect that anything you say can and will be used without expressly warning that suspect that that does not include the statement that they had just given could lead to an entirely reasonable inference that what was just said will, in fact, be used against that suspect. And that's what happened in this case. The agents in this case never even bothered to tell Ethan that if he decided to invoke those rights, the unwarned that he had just made would not be used against him. Without that information, a reasonable person in the suspect's shoes would not feel that he had a choice about whether or not to continue speaking to officers. I mean, he had his dad there. I mean, couldn't he have gone to his dad and told him, hey, these guys are making me uncomfortable. I mean, isn't there some sense here that his father's presence in the home, that he should have known that he could have gone to his dad and tried to get the cops out of there at basically any time? So Ethan's father and his brother were both present in the house. However, the officers kept them separate from Ethan. Ethan was pretty much sequestered to the kitchen table. He was led there immediately once the officers entered the home. Is there any evidence that prior to reading him as Miranda Rights, that the police officers told him he couldn't go visit with his dad, that he couldn't go around the house? I mean, for all he know, when he had his phone and he was checking messages, he could have been texting them. So there's no testimony that he was ever told, no, you cannot leave the kitchen table. However, the officers never told him that he was free to stop talking to them at any point. The officers never conveyed that information to Ethan. And the father was present. The father was never in the kitchen with Ethan, available to speak with Ethan. The officers kept them separate from Ethan so that he never had that moral support. Right. I'm sorry. Go ahead. The rule you're advocating, it seems to me, is almost a per se principle that, that if you don't tell them, when you Mirandize them, and you don't tell them that what they had previously admitted to couldn't be used, that that would be or LSTAT anymore, because the government would lose every time unless they really included another phrase in Miranda. Well, I'm not advocating for a per se rule that the officers must make that advisement to a suspect. But what I am saying... What's unique about this case, though, that would make it appropriate? In this particular case, it's the timing of the given of the Miranda warnings. So Rominger testified that immediately after the confession was elicited in this matter, he went right into giving the Miranda warnings. And then he asked one question afterwards. He said, do you understand this? And then he picked right up where he left off with the questioning. There was absolutely no break. In other cases, even Seabird, there was a break of 15 to 20 minutes. In this case, based on Rominger's testimony, the break was maybe two minutes at most, just long enough for Rominger to read the Miranda warnings and then ask that single question. So there is no ability for Ethan to fully take in the warnings, to appreciate the actual rights that he had and to appreciate the consequences of deciding to waive those rights. But it's an objective standard. We can't look at his... We can't speculate about his under the circumstances that Ethan found himself in would not have been able to appreciate any difference between the pre-Miranda questioning and the post-Miranda questioning. I have a question I'd like to ask you because we're talking a lot about Seabird and Justice Kennedy. Do you win either way, whichever way we apply, whether we apply Seabird or we apply Justice Kennedy's reasoning? Yes. So looking at the Seabird factors, Ethan would prevail because of, again, the officers confronted him with all that information. They purposely pursued a confession. They kept him there at the table with the same two officers for the entirety of the interrogation. There was no break in between the pre- and post-Miranda questioning. That's Seabird. How about Kennedy's application? So again, the same factors that render the confession inadmissible and the post-Miranda statements inadmissible under Seabird also have that impact under Kennedy because the fact that the officers withheld giving that Miranda advisement deliberately until after they had elicited the confession from Ethan shows that they were trying to circumvent Miranda in this case. It shows a deliberateness in their actions because they conferred amongst themselves prior to trying to elicit the confession from that they had made, and there was the opportunity for them to give them Miranda warnings prior to confronting Ethan with the evidence against him in order to elicit the confession, but that did not happen. That shows a deliberateness. Great. Thank you, counsel. I'll give you a little bit of rebuttal time. Let's hear from Ms. Walters for the United States. Good morning, your honors. May it please the court, counsel Tiffany Walters for the United States. Here, Ethan's voluntary statements did not violate Ethan's constitutional rights because he was not in custody at the time that he made his initial confession, and also because under both Justice Kennedy's concurrence and under Seabird's plurality test, those statements would be admissible. Turning first to the question of custody, at the time that Ethan made his initial confession, he had been talking with officers for no more than 50 or 60 minutes. The officers had been invited into the home by Ethan and his brother. They were sitting at the kitchen table. His father was, in fact, going in and out and talking with Ethan, asking him about the pressure cooker. He was not isolated from his family. Tyler was in the back hallway speaking with agents, although from the video you can see throughout various points that the hallway actually opens into the common room in which Ethan was sitting. At times, you can even see the agents in the background. Tyler was possibly within earshot. He may not have been able to hear everything that they were talking about. In addition, Ethan is checking his phone. He's able to get a drink of water. He's able to walk around. In the time before the officers discussed the evidence that they found, all three of the deans are sitting in the living room. There's a break. There's an opportunity, if he wanted to discuss anything with his father or brother, he could have. These aren't the conditions that are the functional equivalent of arrest. Once they found the additional evidence, at that point, Ethan was not free to leave. He was effectively in custody as soon as the officers conferred about the totality of the evidence they had gathered so far. It seems to me that wasn't that a few minutes before he confessed? It was. I would argue, though, that the question for custody isn't whether or not the officers believe he was free to leave, but whether a reasonable person in Ethan's shoes would feel that he was in the functional equivalent of arrest. At that point, when the officers are just conferring, Ethan doesn't know what's been found in the search and doesn't have any of that information. Then they tell him. Then they tell him that we know that there's a missing pressure iron. We found this table with burned marks in the back. Even for custody, police can ask incriminating questions, but for Miranda to be required, we need both the incriminating question and the custody. The question is whether or not that question is sufficient to put Ethan on notice or put a reasonable person on notice that he would not be free to leave. I would agree that this is most similar to the Rice case, but I think the timeline lines up a little differently than how the district court saw it. If you look at Rice, you have agents coming in. They take the defendant to the kitchen table. They ask the brothers to stay in the living room. They ask him an initial question where they say, we know you have illegal guns in the house. Your parents have given us that. That is not in custody. It's only after the officers go and find the gun under the mattress and bring the sawed-off shotgun back and confront Rice with the sawed-off shotgun that that is the moment that custody begins. In this case, merely confronting Ethan with the evidence that there's missing items that were used in the device and then also that there was a burn table out back isn't the same as confronting him with a sawed-off shotgun. So the moment of custody... It's about the Kennedy concurrence that basically says if the interrogation proceeds in a calculated way to elicit a confession, that's his interpretation of Elstad and would be prohibited. So here, under Justice Kennedy's test, you're looking at whether or not there was a deliberate attempt to use this two-step interrogation technique. And here, going to Judge Carson's question earlier, there's no evidence of bad faith. You have the officers beforehand learning what evidence is found in the search and conferring and having a thoughtful discussion about when is the moment of custody? When do we need to provide him random warnings? And that's the kind of conversation that we want to encourage law enforcement to have, to have them to be thoughtful about when Miranda comes into play. But we know from the Supreme Court's case law, from this court's case law, that Miranda is not required prior to custody. And so the officers are left to try and figure out when that moment of custody occurs. And here, they have evidence that's pointing towards Ethan, but they don't have any incriminating statements by Ethan. They know items are missing, and then they found this in being thoughtful, determined that they don't believe Miranda warnings will be required unless, depending on his response to this question. So once they get that response, what is actually shown is good faith. As soon as they hit the point where they realize that, yes, Ethan is no longer free to leave, they immediately stop and provide the Miranda warnings. So under Justice Kennedy's concurrence, there's no evidence of bad faith here. And then the court would turn to LSAT's test, where we would look at both whether or not the pre-Miranda and the post-Miranda statements were voluntarily given. And here, they were. We have Ethan, who's 18 years old. He's sophisticated enough and intelligent enough to develop this device. He's sophisticated enough about his rights to ask about a warrant at the officers. The questioning is not aggressive or hostile. It's polite and respectful throughout the entire encounter. You have the officers. The length and the nature of that questioning that's pre-warning is limited. I mean, I think Ethan would have you look at the entire questioning from the moment you walk in the door. But Miranda and Justice Kennedy's concurrence is only concerned with custodial interrogation. And we know from the moment he walks in the door that he's certainly not in custody. The officers don't think he's in custody. And there's really no reason that he would think before any of this evidence has come to life that he's under the functional equivalent of arrest when he's invited the officers in. We didn't really invite him in. What happened here? They asked to come in and he said, okay. Well, before coming in... I guess, are you going to invite us in? Isn't that sort of inviting yourself in? And then he says, okay. Well, it's also the officers being careful. They're going beyond what they're required. Initially, they're saying sure to allowing him to come in. But before, based on the conversation back and forth between Ethan and Tyler, the officers are going above beyond and want to confirm that they have unequivocal consent to their entry. And so, they ask that question. Are you inviting us in? Certainly agree with that. I just want to make sure. I mean, I don't want it to be characterized here that is like, please come in, officers. We'd love to visit with you. It was at the officer's request to enter that they were given permission. Absolutely. And I don't intend to insinuate that. Certainly, Ethan had initial hesitation, but there was a conversation with Tyler and the brothers agreed to invite them in. So, and I mean, Ethan understood. He initially said, do you have a warrant? So, he has some understanding of his rights. He has some understanding of his ability to say no to officer's request. And all that factors into, you know, whether or not his statements were voluntary, both before and after he received Miranda warnings. Back to your custody argument in regards to this. We're dealing with an 18 year old young lad. And if I'm correct, as I recall reading that once they came in the house, did they immediately take him to the table? Or did they sit down at the couch with just him and the brother being escorted or told to go somewhere else? They say, let's just talk at the kitchen table and go directly to the table. And the brother is in the hallway, which opens the kitchen table. He was not at the table. He was not at the table. He was not at the table. But the kitchen is it's sort of one of these open floor plan situations. So, the kitchen table, the actual kitchen and the living area are all one space without any walls. And the hallway opens directly onto that space. The questions were always directed to this young man. Isn't that correct? The questions by Agent Green and Agent Rominger were, Tyler was speaking with different agents in the back hallway. Now, we know what the district court found. What's the position if this court doesn't agree that under those circumstances, that that would constitute in the 18-year-old mind that he was in custody, he was not free to leave? So, here the district court actually found that he was in, I may not be following your question, Judge Ballock. The district court found that he was in custody at the moment that the officers confronted him with incriminating evidence. What level of deference do we give to that finding? Well, custody is the ultimate question whether or not a reasonable person would feel free to leave is would be reviewed de novo by this court. The factual findings underlying that would be for clear error. All right. So, we have to take for all intents and purposes, you know, realizing that there could be some situation where it would be clearly erroneous. We have to take Judge Johnson's backs here and then we're deciding it fresh from that whether a reasonable person would feel like they could leave. Correct. With the general, you know, in the light most favorable to the government standard for a application of Siebert or Kennedy's construction? Yes. The United States believes that regardless of which test this court applies, the post-Miranda statements would be admissible. Under Siebert, this court would look largely to whether or not the Miranda warnings were effective. So, here we're looking at the completeness and detail of the first round of questioning. Here, accepting the district court's finding that the moment of custody was when the officers asked whether or not he had anything to do with it and confronted him with the incriminating evidence. The pre-Miranda statements that he made were simply just, you know, I did it essentially. There were no further details. There was no further statements made. Immediately, the officers provided the Miranda warnings and everything that followed was different in nature from that. It was the details of how he made the black powder and the napalm and how he planted the device. None of that was covered in the initial statement. And then also, in terms of whether or not the questioning was continuous, I mean, at Siebert, you have the officers engaging in this practice of getting, you know, all the details out in the first statement, taking a break and coming back and effectively cross-examining the defendant with the prior statements. So, referring back to the initial confessions and using those initial confessions to elicit information, that's not what's happening here. We have just the initial admission that I did it and then the officers stop, they give him the Miranda warnings, you know, he's provided, you know, asked if he's understood it and then they go on to question and the questioning is covering entirely different topics. Counsel, let me ask you this because the agent Rominger, I guess is the way you pronounce it, testified that about what happened immediately after the defendant's initial confession. Quote, at that point, I advised him of his Miranda rights and just continued on with the interview. Now, that doesn't seem like there was any break. They knew what they knew and he just kept right on going. Sorry. Is that your understanding of the record? Yes. Essentially, there was no additional break as far as break. Largely, the distinction here from Siebert comes from the fact that the initial statement was so limited and then it wasn't utilized in the second statement and it covered entirely new ground. But here, yes, they're the same officers. There's a continuity of questioning beyond the Miranda rights. And I think looking to the facts of Siebert illustrate why this is so different. In Siebert, you have extensive questioning where the officers are asking the defendant, you intended this victim to die and squeezing her arm and this is happening at three in the morning in a police station after she's been awakened at a hospital. And then they're delaying it and then giving the warnings and then coming back and using those prior statements to get all that information out. We just don't have that scenario here. You have a, at most, a mistake at the moment of custody and then the officers, in good faith, provide the warnings and continue the conversation in a polite, respectful, non-aggressive way in his home with his family present. So, for these reasons, we would request that the court affirm the decision of the district court. Thank you, counsel. Thank you. Kevin, could you put one minute up for questions? Thank you. You may proceed. Thank you, your honor. And just first off, starting with the custody question, the record is pretty clear that Ethan Guillen was, in fact, in custody. The district court did find that he was in custody. Now, Ethan Guillen was 18 years old, just barely 18 years old at the time of this incident. He was taken to the kitchen table immediately by the officers. He was sat there and questioned by two agents, two trained federal agents, for at least an hour until he was forced to confess. Essentially, he was pressured into confessing by the agents. There's no finding he was in custody for that 50 minutes before he confessed, right? No, but he was in the house with several agents. Other than the two agents who were questioning him, there were at least six agents who entered the house initially. By the time he confessed, there were 12 agents, along with two canine dogs, photographers. He was not in a position where a reasonable person would think that he was free to leave, based on the number of officers there, the accusatory questions they were asking, along with the fact that he was never told that he did not have to answer those questions. Thank you. All right. Thank you, Council. We appreciate the argument. Your excuse in the case shall be submitted.